SUSANNE BONIADI (SBN 341512)
susanne.boniadi@afslaw.com
**ARENTFOX SCHIFF LLP**
555 S. Flower St., 43rd Floor
Los Angeles, CA 90071
Telephone: 213.629.7400
Facsimile: 213.629.7401

ADAM D. BOWSER (*pro hac vice forthcoming*)
adam.bowser@afslaw.com
**ARENTFOX SCHIFF LLP**
717 K Street NW
Washington, DC 20006
Telephone: 202.857.6000
Facsimile: 202.857.6395

Attorneys for Defendant
VERGIL SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

L.O., and G.V., individually and on behalf of all others similarly situated,

Plaintiff,

v.

VERGIL SERVICES, INC. D/B/A REDGIFS;

Defendant.

Case No. 2:25-cv-05102-PD

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

*[Filed concurrently with the Declaration of Ade Nichols, and [Proposed] Order]*

Date: March 20, 2026
Time: 1:30 p.m.
Courtroom: Courtroom 580, 5th Floor
Judge: Hon. Patricia Donahue

Complaint Served: Aug. 13, 2025
FAC: Dec. 19, 2025

**NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that at March 20, 2026 at 1:30 p.m. or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Patricia Donahue, located at the Edward R. Roybal Federal Building and United States Courthouse, 350 W. 1st Street, Los Angeles Courtroom 580, 5th Floor, 255 East Temple Street Los Angeles, CA 90012-3332, Defendant Vergil Services, Inc. d/b/a RedGIFs ("RedGIFs") will and hereby does move the Court to compel the claims brought by Plaintiff G.V. to arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and pursuant to the binding arbitration agreement between RedGIFs and Plaintiff G.V.

Defendant's Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Ade Nichols and attached exhibits, the oral arguments of counsel, and any such other matters as the Court may consider.

Pursuant to Civil Local Rule 7-3, counsel for the Defendant met and conferred with Plaintiffs' counsel via videoconference and telephone, multiple times, including, but not limited to, September 24, 2025, November 25, 2025, and January 13, 2026, to potentially resolve this dispute without Court intervention. The parties were unable to reach a resolution.

Dated: January 16, 2026

Respectfully submitted,

**ARENTFOX SCHIFF**

By: /s/Susanne Boniadi
SUSANNE BONIADI
Attorneys for Defendant
VERGIL SERVICES, INC.

# TABLE OF CONTENTS


I. INTRODUCTION .......... 7

II. BACKGROUND .......... 11

A. Plaintiff G.V. Voluntarily Signed Up for a RedGIFs Account, Subject to RedGIFs' Terms. .......... 11

B. The Terms Contained a Binding Arbitration Provision. .......... 13

C. Plaintiff G.V. Did Not Opt Out of Arbitration. .......... 14

III. PLAINTIFF G.V. SHOULD BE COMPELLED TO ARBITRATE .......... 14

A. The FAA Establishes a Strong Policy Favoring Arbitration. .......... 14

B. Plaintiff is Bound by the Arbitration Provision. .......... 15

1. Plaintiff Agreed to the Terms. .......... 16

2. Plaintiff's Claims Are Within the Scope of the Arbitration Provision. .......... 20

C. Plaintiff Should Be Compelled to Arbitrate Her Dispute Consistent with the Arbitration Provision, and This Action Should Be Stayed Pending Arbitration. .......... 21

IV. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) .......... 15

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 14

*B.D. v. Blizzard Ent., Inc.*,
76 Cal. App. 5th 931 (2022) .......... 16

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 15

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) .......... 14, 16, 21

*Dhruva v. CuriosityStream, Inc.*,
131 F.4th 146 (4th Cir. 2025) .......... 17

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) .......... 16, 17

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 19

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) .......... 14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) .......... 20

*Gulf Oil Corp. v. Copp Paving Co.*,
419 U.S. 186 (1974) .......... 15

*H. v. Cybernet Entem't LLC*,
3:25-cv-04682-VC (N.D. Cal.) .......... 8

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) .......... 15

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ........ 18

*Kravets v. Anthropologie, Inc.*,
No. 22-cv-60443-BLOOM/Valle, 2022 WL 1978712 (S.D. Fla. June 6, 2022) ........ 17

*Lee v. DoNotPay, Inc.*,
683 F. Supp. 3d 1062 (C.D. Cal. 2023) ........ 16

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ........ 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ........ 15

*Morrison v. Yippee Ent., Inc.*,
No. 24-7235, 2025 WL 2389424 (9th Cir. Aug. 18, 2025) ........ 19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ........ 15, 16, 21

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 16

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) ........ 16

*Perry v. Thomas*,
482 U.S. 483 (1987) ........ 15

*Sarhadi v. Pear Health Labs, Inc.*,
No. 24-CV-07921-TLT, 2025 WL 1350033 (N.D. Cal. Apr. 18, 2025) ........ 17

*Wallens v. Milliman Fin. Risk Mgmt. LLC*,
509 F. Supp. 3d 1204 (C.D. Cal. 2020) ........ 20

**Statutes**

9 U.S.C. § 1 ........ 11

9 U.S.C. § 2 ........ 14, 15

9 U.S.C. § 3 .......... 21

9 U.S.C. § 4 .......... 15, 21

Fed. R. Civ. P. 11(b)(3) .......... 8

**Other Authorities**

California Privacy Protection Agency .......... 9

DMCA Copyright Policy .......... 13

Electronic Communications Privacy Act .......... 11

Federal Arbitration Act .......... *passim*

RedGIFs's Privacy Policy .......... 11, 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This is a case that should have never been filed – either before this Court *or* in arbitration. It started with three individuals, D.M., L.O. and G.V, claiming they had each registered for an account on the RedGIFs website "and utilized" their accounts "on multiple occasions in 2024 and 2025, to view pornographic media." Compl.[1] ¶¶ 17, 22, 27. Like most online accounts, if D.M., L.O. and G.V. had registered for RedGIFs accounts as alleged, they would have received email confirmation messages, as well as the continued ability to log into their accounts. Nichols Decl.[2] ¶ 8. In other words, these basic allegations, central to their entire case, should have been easily and independently verifiable to Plaintiffs and their counsel before filing the original Complaint.

As it turns out, however, D.M. never even visited the RedGIFs website, and exited the case. *See*, *generally*, Am. Compl.[3] L.O. now claims that while she has visited the website, she "never registered for an account on the Website." *Id.* ¶ 17. She alleges this while simultaneously asserting that "any person who wishes to browse even its free content must register for an account on the Website to gain access." *Id.* ¶ 4.[4] And for her part, G.V. now claims that while she did not register for an account in 2024 as originally alleged, she did so "in our [*sic*] around April of 2025." *Id.* ¶ 22. Notably, G.V.'s actual registration occurred around the same time as her counsel's. Nichols Decl. ¶ 6.

Thus, of the three original Plaintiffs who represented to the Court that they had registered for RedGIFs accounts two years ago and frequently used their accounts

---

[1] *See* Class Action Complaint (ECF No. 1) ("Complaint").

[2] Declaration of Ade Nichols in Support of Motion to Compel Arbitration ("Nichols Decl.").

[3] Amended Class Action Complaint (ECF No. 26)

[4] These two allegations cannot be reconciled, but it's easily verifiable that (1) anyone can access the RedGIFs website without registering, and (2) *all* the content on the website is free. Nichols. Decl. ¶ 5.

since that time, only one *ever* did. And even then, G.V. registered shortly before the original Complaint was filed, along with her attorney. Further, the only activity RedGIFs could actually discern for any of the Plaintiffs on its website was that G.V. registered for an account on April 17, 2025, and did nothing more that day. Nichols Decl. ¶ 11. While she returned the following day, she never left the homepage and never clicked on *any* video. *Id.* That was her last time on the website as far as RedGIFs can tell, as she has never logged in again. *Id.* ¶¶ 11-12.

If this litigation activity seems inorganic and suspect, it's also not an isolated occurrence either. The same litigation group has been pursuing identical scattershot complaints against other pornography websites, including in the recently dismissed case *H. v. Cybernet Entem't LLC*, 3:25-cv-04682-VC (N.D. Cal.). In that matter, Judge Chhabria issued an Order to Show Cause "why the case should not be dismissed" because of similar conduct. ECF No. 24. In response, Plaintiffs' counsel informed the court that instead of (timely) opposing a motion to dismiss, they similarly "amended their to complaint to specify that, while Plaintiff C.C. did view pornographic videos on the Website, she did not register for an account to do so." ECF No. 25 at 5. Ultimately, after Judge Chhabria ordered that he "will impose sanctions if plaintiffs continue to litigate the case recklessly," ECF No. 38, the plaintiffs dismissed the case. ECF No. 39.

Unfortunately for RedGIFs, what's past is prologue, as previewed above. With respect to Plaintiffs' counsel, there is no legitimate reason they could not have confirmed whether their clients registered for an account before filing suit, as they could have, and should have, simply asked their clients for their login credentials, the email confirmation message they would have received, or their browsing history to confirm they've even been on the website; basic due diligence to ensure that the core factual representations made to the Court have evidentiary support. *See* Fed. R. Civ. P. 11(b)(3).

And that's before we even get to the "merits" of Plaintiffs' only real complaint here: that RedGIFs is one of the tens of millions of websites that uses Google Analytics, the most widely deployed website-analytics tool in the world.[5] Indeed, just how common is it for website operators to use Google Analytics? The Court's own PACER website utilizes it, including in such a way that website visitors' search terms are sent to Google:




The California ***Privacy Protection*** Agency also uses it in the same way:

[5] By some estimates, over half of *all websites* use Google Analytics. *See* https://www.narrative.bi/analytics/google-analytics-statistics-ga4-included#:~:text=Google%20Analytics%20remains%20a%20dominant,are%20using%20Google%20Analytics%204




So too does Plaintiffs' counsel on their website:



As the screenshot above demonstrates, if a prospective client searches their website for legal advice, such as "Do you handle drug charges?", that query would be collected and sent to Google too. And Plaintiffs are expressly taking the position here that simply *visiting* the RedGIFs website is somehow a "communication" protected under *criminal laws* like the Electronic Communications Privacy Act. *See, e.g.*, Am. Compl. ¶ 111. It is therefore difficult to imagine a less principled pursuit of other businesses for setup claims under criminal law for doing *exactly* what they are doing themselves.[6]

Does this mean that Plaintiff's counsel and ***every level*** of government in California are also violating the ECPA and the slew of other claims Plaintiffs are alleging? Of course not – the Court does not need to arrest of its entire IT Department. A website operator's use of Google Analytics does not turn a simple website visit into a federal case. However, while both of Plaintiffs' remaining claims lack merit for several reasons, the only one the Court need reach here with respect to Plaintiff G.V. is that her claims never should have been filed with the Court. Rather, when she registered for an account, she agreed to resolve her claims, such as they are, in arbitration. Accordingly, as required by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), this Court should compel Plaintiff G.V. to arbitrate her claims against RedGIFs on an individual basis.

## II. BACKGROUND

### A. Plaintiff G.V. Voluntarily Signed Up for a RedGIFs Account, Subject to RedGIFs' Terms.

On April 17, 2025 Plaintiff G.V. voluntarily signed up for a RedGIFs account. Nichols Decl. ¶¶ 9, 11. She did so by visiting RedGIFs' website at

[6] Not to belabor the point, but Plaintiffs' counsel would be the *only* one here that would arguably have a potential duty, to both their clients and prospective clients, if website visits and searches were actual "communications." And even more ironically, as between RedGIFs, the Court's PACER website, the California Privacy Protection Agency, and Plaintiffs' counsel, the latter is the *only* one that does *not* have a privacy policy on their website. *See* https://slfla.com/.

https://www.redgifs.com/, where she was presented with the following image:




*Id.* ¶ 14.

As can be seen in the screenshot above, closely below the "Sign Up" button that Plaintiff clicked in order to sign up, was the disclosure, "By continuing, you agree to our policies Terms of use * Privacy Policy." *Id.* ¶ 15. The words "Terms of use" and "Privacy Policy," above were hyperlinks in highly contrasting colors (bright pink on navy) that exceed website accessibility standards for color contrast for users with vision disabilities. *Id.* ¶ 16. Further, "Terms of use" ("Terms") was hyperlinked to the RedGIFs User Terms of Service, which at the time G.V. created an account, were the Terms that were in effect on the website since December 11, 2020.[7]

Again, Plaintiff completed this sign up process on April 17, 2025 to create a RedGIFs account by entering a username and email address, and then affirmatively clicking the "Sign Up" button as pictured above.

**B. The Terms Contained a Binding Arbitration Provision.**

The Terms contained clear notice that a user like G.V. was agreeing to arbitration, and an unambiguous provision that "ALL DISPUTES" regarding "YOUR USE OF THE SERVICES, AND/OR RIGHTS OF PRIVACY … WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION." Nichols Decl., Ex. 1. More specifically, the Terms immediately notified users:

> This Terms of Service agreement (together with RedGIFs's Privacy Policy (www.redgifs.com/privacy) and DMCA Copyright Policy (www.redgifs.com/dmca)) govern your access and use of www.redgifs.com (the "Site") and all other products, services, features, content or applications that link to these Terms (together with the Site, the "Services") offered by Vergil Services, Inc. ("RedGIFs", "we", "us" or "our").
>
> Please read these Terms fully and carefully before using the Services, because these Terms form a legally binding contract between you and RedGIFs for your use of the Services. As described in Section 12, you agree that unless you opt out, all disputes between you and RedGIFs will be resolved by individual arbitration, and you waive your right to trial by jury, or to participate in a class action lawsuit or class-wide arbitration.

[7] Available at RedGIFs User Terms of Service | RedGIFs.

After notifying users of the arbitration clause at the outset, the Terms further provided in relevant part:

> **YOU AGREE THAT ALL DISPUTES BETWEEN YOU AND US** OR OUR OFFICERS, DIRECTORS OR EMPLOYEES IN THEIR CAPACITY AS SUCH (WHETHER OR NOT SUCH DISPUTE INVOLVES A THIRD PARTY) WITH REGARD TO YOUR RELATIONSHIP WITH US, **INCLUDING WITHOUT LIMITATION DISPUTES RELATED TO** THESE TERMS, **YOUR USE OF THE SERVICES, AND/OR RIGHTS OF PRIVACY AND/OR PUBLICITY, WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION** IN ACCORDANCE WITH THE STREAMLINED ARBITRATION RULES AND PROCEDURES OF JAMS, INC. THEN IN EFFECT, AND YOU AND WE HEREBY EXPRESSLY WAIVE TRIAL BY JURY.

*Id.* (emphases added).

### C. Plaintiff G.V. Did Not Opt Out of Arbitration.

After Plaintiff G.V. signed up for an account, subject to the arbitration provisions above, RedGIFs never received any written notice that she was electing to opt out of the arbitration provision. *Id.* ¶ 19.

## III. PLAINTIFF G.V. SHOULD BE COMPELLED TO ARBITRATE

### A. The FAA Establishes a Strong Policy Favoring Arbitration.

Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress has expressed a strong public policy favoring arbitration, requiring courts to "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). In order to "reverse the longstanding judicial hostility to arbitration agreements," Congress enacted the FAA, "plac[ing] arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place

arbitration agreements on an equal footing with other contracts and enforce them according to their terms." (citation omitted)); *Perry v. Thomas*, 482 U.S. 483, 489 (1987) (describing the FAA as "'a congressional declaration of a liberal federal policy favoring arbitration agreements'" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (noting the "emphatic federal policy in favor of arbitral dispute resolution").

For the FAA to apply, arbitration agreements must meet only two conditions: (1) they must be in writing and (2) they must be part of "a contract evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2. Agreements that satisfy both of these requirements are "valid, irrevocable, and enforceable" under federal law. *Id.*

Both elements are satisfied here. The Arbitration Provision is in writing and specifies that it is governed by the FAA. (*See* Nichols Decl., Ex. 1 ("This dispute resolution provision will be governed by the Federal Arbitration Act and not by any state law concerning arbitration"); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995) (holding that the FAA applies to all contracts that "in fact 'involv[ed]' interstate commerce, even if the parties did not contemplate an interstate commerce connection"); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974) ("[T]he flow of interstate commerce [includes] the generation of goods and services for interstate markets and their transport and distribution to the consumer.").

### B. <u>Plaintiff is Bound by the Arbitration Provision.</u>

The FAA requires courts to compel arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. To effectuate this directive, courts generally examine two "gateway" issues in deciding whether to grant a motion to compel arbitration: (1) whether the parties agreed to arbitrate and (2) if so, whether the agreement encompasses the asserted claims. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). When a court

finds that both of these elements are satisfied, it must compel arbitration. *See Byrd*, 470 U.S. at 218 ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts ***shall*** direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). Further, "any doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. 1, 24-25 (1983).

**1. Plaintiff Agreed to the Terms.**

"[M]utual assent, or consent, of the parties is essential to the existence of a contract.'" *Lee v. DoNotPay, Inc.*, 683 F. Supp. 3d 1062, 1075 (C.D. Cal. 2023) (alteration in original) (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 943 (2022)). Consumer contracts formed online are valid and binding, even without evidence that an internet user had actual knowledge of the contractual terms, if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024). Both elements are assessed under the "totality of the circumstances." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514 (9th Cir. 2023); *see also Edmundson v. Klarna, Inc.*, 85 F.4th 695, 705-06 (2d Cir. 2023) (holding that "uncluttered" interface, and underlined hyperlinks that were "spatially and temporally coupled with the user's transaction," and presentation of terms "when the user is about to receive a benefit" together established reasonably conspicuous notice of online terms); *Lee*, 683 F. Supp. 3d at 1070-71, 1075 (holding that clicking "Continue" button above hyperlink that contrasted with background in readable size, where whole screen visible at once and sign-up screen procured ongoing membership, established assent to terms).

First, Plaintiff G.V. had reasonably conspicuous notice of the Terms. The notice

language was conspicuously displayed near the sign-up button when Plaintiff signed up for a free account, on an uncluttered screen with an unambiguous textual notice that by continuing with the sign up, the user was expressly agreeing to RedGIFs' policies, i.e., both its Terms and Privacy Policy. That notice contained an underlined hyperlink to the Terms ("Terms") in close proximity to the "Sign Up" button. The surrounding design of the pop-up was minimalistic, and the black background clearly contrasted with the hyperlink's bright yellow color.

G.V. was presented with the "Terms" hyperlink simultaneously with her decision to sign up to receive text messages from RedGIFs. The hyperlink was therefore both "spatially and temporally coupled" with the event of signing up for text-messaging services. *See Edmundson*, 85 F.4th at 706. What is more, the "Terms" were presented in conjunction with entering into an ongoing relationship to have a RedGIFs account. Under such circumstances, a reasonable internet user would infer that the "Terms" constituted the contractual terms to that relationship. Thus, a "reasonably prudent" internet user would have had notice of the Terms based on the "clear and conspicuous way" in which they were presented. *Id.* at 704; *see also Kravets v. Anthropologie, Inc.*, No. 22-cv-60443-BLOOM/Valle, 2022 WL 1978712, at *5 (S.D. Fla. June 6, 2022) (concluding that white hyperlink to "Terms" above button to sign up for text messaging was sufficiently conspicuous); *Dhruva v. CuriosityStream, Inc.*, 131 F.4th 146, 152 (4th Cir. 2025) ("a reasonably prudent internet user would have known that the hyperlinked terms of use here applied to the subscription being finalized on the same page."); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80 (2d Cir. 2017) ("signing up for account" "clearly contemplate[s] some sort of continuing relationship"); *Sarhadi v. Pear Health Labs, Inc.*, No. 24-CV-07921-TLT, 2025 WL 1350033, at *6 (N.D. Cal. Apr. 18, 2025) (interaction "was more than a one-time purchase or transaction. Plaintiff was required to create an Aaptiv account and then engaged in an ongoing relationship with Aaptiv.").

Indeed, a comparison of RedGIFs' sign-up process to the one analyzed and found to be enforceable by the Ninth Circuit in *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005 (9th Cir. 2024), demonstrates that the RedGIFs' sign-up process clearly binds a user like G.V. to the Terms. In *Keebaugh*, the Court of Appeals found that the following presentation was enforceable when the user clicked the "Play" button below:




*Id.* at 1011. As an initial matter, the Court of Appeals found that the "context of the transaction is sufficient" to provide "reasonably conspicuous notice" of the Terms. *Id.* at 1019-20. The panel reasoned that downloading "[a]n app is different from a typical one-and-done interaction between the user and a traditional website—the app's presence on the phone until deleted carries the connotation that the user will also have ongoing access to that app unless something material changes." *Id.* at 1020. Here too, registering

for an account in order to be able to upload videos and otherwise curate content of interest goes beyond the one-and-done visit, and thus the context of signing up for ongoing account should have been sufficient by itself to put G.V. on notice of the Terms.[8] *See also Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 926 (N.D. Cal. 2024) ("The Court finds that users of Coursera's services, a platform that offers online educational courses via pre-recorded videos, would similarly expect (or should expect) their access to the platform would be continual and governed by some terms of use.").

Second, and independently, Plaintiff unambiguously and affirmatively manifested assent with objectively conspicuous notice of the Terms. She entered her email and created a username and clicked the button reading, "Sign Up." Below this button on an otherwise uncluttered screen, the notice provides, "By continuing, you agree to our policies Terms of use * Privacy Policy." Nichols Decl. ¶¶ 16. This textual notice is unambiguous in context: by clicking the "Sign Up" button – the only action one could take to continue – she was agreeing to the Terms and Privacy Policy. Again, in contrast to the Game of Thrones sign-up screen above, with its comparatively much smaller text and lack of underlined hyperlinked Terms, RedGIFs' presentation is clearly designed to provide reasonable notice of the Terms. *See Morrison v. Yippee Ent., Inc.*, No. 24-7235, 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025) (reversing district court's decision denying motion to compel arbitration in VPPA case because "the presence of other hyperlinks or placement within a multi-line paragraph did not negate its conspicuousness.").

At bottom, Plaintiff G.V. should have reasonably expected to be agreeing to Terms governing her ongoing account with RedGIFs. Further, the presentation of these Terms, coupled with the textual notice of the legal consequences of signing up

[8] To be sure, RedGIFs believes that G.V.'s sign up had more to do with setting up a (meritless) digital slip-and-fall claim than a genuine intent to create an account for legitimate purposes. But that doesn't change the fact that G.V. could have experienced these enhanced features only available to users who signed up for an account like she did.

for an account, removes any doubt that G.V. bound herself to RedGIFs' Terms.

**2. Plaintiff's Claims Are Within the Scope of the Arbitration Provision.**

Under the plain terms of the Arbitration Provision, Plaintiff's claims must be arbitrated. It is well established that "the court must resolve any issue that calls into question the . . . applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). Here, Plaintiff's claims are clearly within the scope of the Arbitration Provision. The Arbitration Provision applies to "ALL DISPUTES BETWEEN YOU AND US … WITH REGARD TO YOUR RELATIONSHIP WITH US, INCLUDING WITHOUT LIMITATION DISPUTES RELATED TO THESE TERMS, YOUR USE OF THE SERVICES, AND/OR RIGHTS OF PRIVACY AND/OR PUBLICITY."

All of Plaintiff's claims easily fit within the broad scope of the Parties' agreement. Her dispute is clearly about her use of RedGIFs' website – the "Services" – and each of her claims also raise (meritless) privacy disputes. Courts within the Ninth Circuit routinely interpret similar language as encompassing *any* disputes between the parties, including any disputes arising before the agreement. *Wallens v. Milliman Fin. Risk Mgmt. LLC*, 509 F. Supp. 3d 1204, 1213 (C.D. Cal. 2020) ("Despite Wallens's contention that the Agreement does not cover claims that pre-exist the Agreement, the broad language of the parties' Agreement proves otherwise.").

Accordingly, any dispute Plaintiff D.V. has concerning her visits to the RedGIFs website – which are the only disputes she has – are clearly within the scope of the arbitration provision to which she agreed when she signed up for an account.

### C. Plaintiff Should Be Compelled to Arbitrate Her Dispute Consistent with the Arbitration Provision, and This Action Should Be Stayed Pending Arbitration.

Where an arbitration agreement is governed by the FAA and a dispute is within its scope, a court's duty is clear: it must compel the parties to comply with their arbitration agreement and stay further judicial proceedings. *See* 9 U.S.C. §§ 3, 4; *see also Byrd*, 470 U.S. at 218 ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22 ("The [FAA] provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4."). Here, the Dispute Resolution Procedure contains a binding Arbitration Provision that encompasses Plaintiff's claims. It follows that this Court should direct Plaintiff to comply with the Arbitration Provision. *See Byrd*, 470 U.S. at 218.

Further, Section 3 of the FAA provides that in any lawsuit "referable to arbitration," the court "***shall*** on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). Because a binding arbitration agreement applies to Plaintiff D.V.'s claims, Plaintiff must comply with the Arbitration Provision, and the Court is compelled to stay this action pending the outcome of any arbitration.

## IV. CONCLUSION

For the foregoing reasons, RedGIFs respectfully requests that this Court grant its Motion and compel G.V. to arbitrate her claims.

Dated: January 16, 2026

Respectfully submitted,

**ARENTFOX SCHIFF**

By: */s/ Susanne Boniadi*
SUSANNE BONIADI
Attorneys for Defendant
VERGIL SERVICES, INC.

**<u>LOCAL RULE L.R. 11-6.2 CERTIFICATE OF COMPLIANCE</u>**

The undersigned, counsel of record for Defendant Vergil Services, Inc. certifies that this brief contains 3,913 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 16, 2026

Respectfully submitted,

**ARENTFOX SCHIFF**

By: */s/ Susanne Boniadi*
SUSANNE BONIADI
Attorneys for Defendant
VERGIL SERVICES, INC.